Joseph BORECKI, Plaintiff,

v.

EASTERN INTERNATIONAL MANAGEMENT CORPORATION, et al., Defendants.

Civ. A. No. 86–0887.

United States District Court, D. New Jersey.

Aug. 2, 1988.

DeStefano & Guernsey by Carolyn D. Freeman (argued), Cherry Hill, N.J., for plaintiff.

Brown & Connery by John J. Mulderig, Westmont, N.J. and Morgan, Lewis & Bockius by Mark S. Dichter, Michael L. Banks (argued), Philadelphia, Pa., for defendants.

## OPINION

COHEN, Senior District Judge:

Plaintiff, Joseph Borecki, commenced this action against his former employers, Eastern International Management Corporation ("Eastern") and Aetna Insulated Wire Company ("Aetna"), and two of their officers, Louis Goodfarb and James Fallon, alleging he was wrongfully terminated in August, 1984. He asserts claims for wrongful discharge (Count I), intentional interference with an economic relationship (Count II), intentional infliction of emotional distress (Count III), and violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA") (Count IV). Defendants Eastern and Aetna now move for summary judgment as to Counts II and III and defendant Goodfarb moves

for summary judgment as to all Counts.[1] For the reasons which follow, the corporate defendants' motions shall be granted and defendant Goodfarb's motion shall be granted in part and denied in part.

## FACTS

Plaintiff was employed by Eastern and/or Aetna from 1959 until August 22, 1984.[2] In 1976, plaintiff was promoted to Vice President in charge of sales, a position he held until his employment relationship with the defendant corporations ended. He was then sixty-one years of age.

In 1980, the federal government investigated Eastern, Aetna, and other companies owned and/or controlled by defendant Goodfarb for fraudulent practices in the sale of insulated wire and cable. As a result of this investigation, Eastern pled no contest to a 38 count federal indictment and agreed to pay a fine of one and a half million dollars. Defendant Fallon, then Vice President of Finance, pled guilty to obstruction of justice and was sentenced to 179 days in jail. Defendant Goodfarb, then President and principal stockholder of Eastern and Aetna, pled guilty to obstruction of justice and perjury and was sentenced to seven years in prison.

Both individual defendants entered the Allenwood Federal Penitentiary in August, 1983. Fallon remained incarcerated until January, 1984, at which time he returned to his prior employment. Goodfarb was not released from prison until 1987. Apparently, however, he continued to receive compensation from the corporations. His federal income tax returns indicate he was employed as an "Executive" with Eastern Management Corp. and had wage income of $299,719 in 1984 and $549,486 in 1985. Eastern's corporate tax returns list Goodfarb as an "officer" and state he devoted one hundred percent of his time to business.

Plaintiff alleges he met with Fallon on August 22, 1984 and was informed his employment was being terminated.[3] He was replaced with Robert Hall, who was then thirty-eight years old and whose compensation was allegedly far less than the plaintiff's.

Plaintiff thereupon filed two complaints with the New Jersey Division on Civil Rights and the Equal Employment Opportunity Commission ("EEOC"), one against Eastern and Aetna, and one against Aetna alone. The complaints contain no reference to any actions by defendant Goodfarb, but the EEOC did mail copies of the complaints to the Chief Executive Officer of the named respondents. The defendant corporations responded through their attorney, A. Martin Herring, Esquire, who apparently was also Goodfarb's personal attorney. On October 23, 1985, the EEOC notified Herring that it was terminating its investigation. The record contains no evidence that the EEOC held any conciliation discussions.

Plaintiff then instituted the instant action. He alleges he was terminated in retaliation for his refusal to assist the individual defendants in destroying or altering documents sought by the government during its investigation and that Fallon acted with the authorization and acquiescence of Goodfarb. Complaint ¶¶ 11, 12. He further claims the individual defendants' actions "constitute a willful and intentional interference with the economic relationship between plaintiff and defendant corporation," *id.* at ¶ 16, and that defendants' conduct amounts to the intentional infliction of emotional distress. *Id.* at ¶ 20. Finally, he claims his discharge violated the ADEA.

---

**1.** All defendants were initially represented by the same counsel. Due to a potential conflict of interest, we granted a motion by counsel to withdraw as representative for defendant Fallon.

**2.** Plaintiff was initially employed by Eastern Electric Sales Company, Inc. From the record, it appears Eastern Electric has done business under various names and that Aetna is a ficti-

tious name by which it does business. Eastern International Management Corp. pays the salary and benefits for certain key executives who provide services on behalf of Aetna.

**3.** Defendants contend plaintiff resigned voluntarily. For purposes of the instant motion, however, they accept as true plaintiff's contention.

Defendant Goodfarb moves for summary judgment, claiming he did not participate in the decision to terminate the plaintiff's employment and cannot, therefore, be liable under any of the above theories. He also urges he is entitled to summary judgment for other reasons. Thus, he argues he is not subject to suit on the age discrimination charge, since the EEOC complaints neither name nor refer to him. He also maintains that a cause of action for wrongful discharge lies only against an employer, and that even if he participated in the decision he was not plaintiff's employer.

All defendants move for summary judgment on plaintiff's claim for interference with an economic relationship. They contend that liability may not be imposed on either a corporation, a corporate employee acting within the scope of his employment, or a corporate officer for interfering with an individual's employment and contractual relationship with that corporation. Defendants also urge that a wrongful termination, standing alone, cannot constitute the intentional infliction of emotional distress. The corporate defendants do not seek summary judgment on plaintiff's claims of age discrimination and wrongful discharge.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment may only be granted where the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hersh v. Allen Prods. Corp., Inc.*, 789 F.2d 230, 232 (3d Cir.1986). Once the moving party has directed our attention to that portion of the record which it believes demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)). If the non-moving party then fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial" summary judgment must be entered. *Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200, 202 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). In determining if such a showing has been made, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)).

■ We consider first Goodfarb's contention that he had no involvement in the decision to terminate the plaintiff's employment. While he offers additional reasons why he may not be found liable under any of the theories posited by the plaintiff, he claims his lack of participation in the decision entitles him to summary judgment on all counts.

At the time of the decision, Goodfarb was incarcerated and he states in his affidavit that he had no input in the day-to-day operations of Aetna or Eastern. Goodfarb Affidavit ¶ 2. This is consistent with the scenario drawn by Fallon, who states he assumed all of Goodfarb's responsibilities, Fallon Deposition, p. 20, and had the authority to hire and fire Vice Presidents of the corporations. *Id.* at 19. Both Fallon and Goodfarb have specifically denied any involvement by the latter in the decision to terminate plaintiff's employment. Thus, Fallon testified at his deposition:

Q: Did Mr. Goodfarb make any decisions regarding Mr. Borecki's termination?

A: No, he did not.

Q: So any decisions that were made were totally made by either you or Joe Borecki. Is that correct?

A: That's correct.

Fallon Deposition, p. 43. Similarly, Goodfarb maintains he did not participate in any such decision and did not even learn the plaintiff had ceased working for Eastern

and Aetna until after the fact. Goodfarb Affidavit ¶ 2; Goodfarb Deposition, pp. 54–55. Finally, Goodfarb relies on plaintiff's deposition testimony that Fallon told the plaintiff that he alone had made the decision. Borecki Deposition, pp. 176–77.

In response, plaintiff first points to Goodfarb's historical control of the defendant corporations. Thus, he avers that Goodfarb made all major decisions affecting Eastern and Aetna prior to his incarceration, as well as many minor decisions, Borecki Affidavit ¶ 5, a view shared by other employees. *See* Urbanelli Affidavit ¶ 6; Tumulo Affidavit ¶ 3. Moreover, plaintiff states that "[d]uring the years I worked for Mr. Goodfarb, he specifically told me that the hiring and firing of all sales and managerial personnel must first be approved by him. In practice, I always got Mr. Goodfarb's approval before I hired or fired anyone." Borecki Affidavit ¶ 6.

■ Next, plaintiff offers evidence tending to show Goodfarb's continuing relationship with the corporation during his incarceration. Plaintiff notes that Goodfarb admits that, while incarcerated, he fired Fallon and hired his replacement. Goodfarb Deposition, p. 39. Plaintiff also produces

Eastern's telephone records from September, 1983 to December, 1984, which indicate Eastern frequently accepted collect calls from a single number in the town where Goodfarb was incarcerated.[4] As evidence of the calls' contents, plaintiff presents the affidavit of Louis Tumulo, a former Vice President of Eastern, who avers that on several occasions "I was in Mr. Fallon's office when Mr. Goodfarb called him from prison and I heard Mr. Fallon discuss Aetna's business decisions with him." Tumulo Affidavit ¶ 6.[5] Eastern's former receptionist also states that between January, 1984 and May, 1986, she received and delivered to Fallon at least three letters a week bearing Goodfarb's return address. Conway Affidavit ¶ 5. Lastly, plaintiff notes that both Goodfarb's and Eastern's tax returns show the payment of substantial wages to Goodfarb during his incarceration for work as an "executive" or "officer," and that according to Eastern's tax return Goodfarb devoted all of his time to corporate business in 1984 and 1985.

Finally, plaintiff claims various inconsistencies in Fallon's statements undermine his assertion that Goodfarb did not participate

---

**4.** Although defendant notes these phone calls were accepted, on average, only about twice a week in the two months immediately preceding plaintiff's termination, they occurred far more frequently at other times for which Eastern's phone records have been produced. Constant contact by Goodfarb in the period right before plaintiff's termination might be an indication that he participated in a decision affecting plaintiff's employment. The amount of contact over an extended period of time, however, is offered primarily to establish Goodfarb's continuing participation in the affairs of the defendant corporations. This may be far more probative of his involvement in a major decision affecting the corporations—a decision which may have been made at any time and which may have engendered little discussion—than the number of phone calls in the time period surrounding plaintiff's termination.

**5.** As defendants correctly observe, hearsay evidence and evidence not based on personal knowledge may not defeat a summary judgment motion. This has long been the rule. *See, e.g., Gostin v. Nelson,* 363 F.2d 371 (3d Cir.1966) (personal knowledge); *Rossi v. Trans World Airlines,* 507 F.2d 404 (9th Cir.1974) (per curiam) (hearsay); *Pan–Islamic Trade Corp. v. Exxon*

*Corp.,* 632 F.2d 539 (5th Cir.1980) (hearsay), *reh. denied,* 642 F.2d 1210 (1981), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *see generally* 6 Pt. 2 J. Moore and J. Wicker, *Moore's Federal Practice* ¶ 56.22[1] and nn. 18 and 24 (2d Ed.1987).

The Supreme Court's statement in *Celotex, supra,* that "[w]e do not mean that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment," 106 S.Ct. 2553–54, has not altered these requirements. It merely refers to the fact that affidavits and other materials listed in Fed.R.Civ.P. 56(c) may be submitted and that a party need not, therefore, depose her own witnesses. *Id.* While the form in which the evidence is presented need not be admissible at trial, the evidence itself must be. *See, e.g., Bushman v. Halm,* 798 F.2d 651, 660 (3d Cir. 1986). Thus, we have not considered evidence which defendant properly objects to as being based on hearsay or lacking personal knowledge.

The objection offered to the quoted portion of Tumulo's affidavit is that it lacks specificity as to when he overheard Fallon's conversations with Goodfarb and the contents of those conversations. This, however, goes to the weight and not the admissibility of Tumulo's averment.

in the decision. Thus, plaintiff notes that while Fallon maintained he assumed Goodfarb's responsibilities during the latter's incarceration, he also stated:

Q: During the period of time I understand that you were acting president of Eastern International Management.

A: No, I was not.

Q: You were never acting president?

A: No.

Q: So your position, vice-president of finance, never changed?

A: No, it did not.

Q: You never assumed additional duties?

A: No, not in the Management Company.

Q: Could you just in a general sense tell me your duties as vice-president of finance?

A: I was responsible for the assets of the company and the cash and the inventory.

Q: Anything else?

A: No.

Fallon Deposition, p. 18. Immediately thereafter, however, when directly questioned as to his authority to hire and fire other vice-presidents, he claimed to have such authority. *Id.* at 19. Moreover, plaintiff notes Fallon's admission that there were no verbal or written agreements between him and Goodfarb concerning his assumption of Goodfarb's duties. *Id.* at 27.

Viewing this evidence in the light most favorable to the plaintiff, we find a genuine issue of material fact exists as to whether Goodfarb was involved in the decision to terminate plaintiff's employment. While direct evidence is lacking, numerous pieces of indirect evidence could support a finding of his participation in the challenged conduct.[6] The frequent phone calls and correspondence may be indicative of his participation in the day-to-day operations of the corporate defendants, and Tumulo's testimony indicates that at least some of the conversations concerned Eastern or Aetna. While, as defendants observe, Tumulo's statement lacks specificity as to either the particular decisions discussed or the timing of the conversations, it does cast doubt on the individual defendant's denials that they communicated on decisions involving Eastern or Aetna.[7] Similarly, while Goodfarb contends the numerous letters dealt almost exclusively with Verdi Realty Corporation ("Verdi") there has been no showing of the relationship, if any, between Verdi and Eastern or Aetna, nor of Fallon's involvement with Verdi. Given the evidence of the tight control Goodfarb had traditionally exercised over all aspects of the corporate defendants' business, including personally making all of their major decisions, a jury could reasonably find the contacts between Goodfarb and Fallon to have been, at least in part, related to the corporate defendants' business. Moreover, if plaintiff's evidence that Goodfarb had always insisted on approving any employment decisions affecting managerial or sales personnel is believed, a jury could rationally conclude that a decision to fire a senior executive with twenty-five years of experience would have been one of the topics addressed in the

---

**6.** In *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.) (in banc), *cert. denied,* — U.S. —, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987), and *Sorba, supra,* the Third Circuit applied the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to ADEA cases. This enables a plaintiff to establish a *prima facie* case of age discrimination by indirect evidence. *Sorba, supra,* 821 F.2d 200, 202. Should he do so, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason for the discharge." *Id.* If defendant makes such a showing, "the plaintiff must prove by a preponderance of the evidence that the proferred reasons were not the employer's true reasons." *Id.*

While this framework applies only in determining an employer's motive, it does not preclude the use of indirect evidence to establish the identity of plaintiff's employer. By utilizing these shifting burdens for one purpose, the Third Circuit did not thereby limit the use of indirect evidence on other issues in an ADEA case. Thus, it is admissible to the same extent as in any other civil matter.

**7.** Indeed, if Tumulo's failure to recite the decisions discussed is due to an inability to remember them, it may indicate they were not major ones, but rather were more mundane in nature.

telephone conversations and correspondence.[8]

Finally, our conclusion finds some support in Goodfarb's own words. At his deposition, conducted while he was in prison, he stated that "I control all the companies." Goodfarb Deposition, p. 12. While this is not necessarily at odds with his position of non-involvement in the operations of the corporate defendants, it may be construed as consistent with plaintiff's assertion that Goodfarb was involved in significant decisions. On this motion, of course, we are bound to adopt the latter construction.[9]

Since a genuine issue of material fact exists as to Goodfarb's role in the decision to terminate plaintiff's employment, his request for summary judgment on all issues based on his nonparticipation in the decision must be denied.

■ We turn then to the other arguments advanced in support of the motion for summary judgment on the individual counts of the complaint. Before initiating an age discrimination suit, a party must first file a charge with the EEOC. 29 U.S.C. § 626(d). Goodfarb maintains that since he was not named in plaintiff's EEOC charge, he is entitled to summary judgment on Count IV of the complaint.

In *Glus v. G.C. Murphy Co.*, 562 F.2d 880 (3d Cir.1977), the Third Circuit considered whether an entity not named as a respondent in an EEOC complaint could be sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The Court explained that requiring resort to the EEOC was intended to give notice to the aggrieved party and to afford the opportunity for voluntary compliance. *Id.* at 888. Finding a liberal construction of this jurisdictional requirement to be appropriate, it set forth several factors which should guide a district court in determining if a suit should be permitted to proceed against a party not named in an EEOC charge:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for purposes of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.*

Here, the first factor clearly supports Goodfarb's position. The plaintiff not only could have ascertained Goodfarb's role in the alleged discrimination, but admits he actually knew of it. Plaintiff's Memorandum, p. 23 at n. 15. Similarly, the fourth factor does not support our exercise of jurisdiction. Plaintiff has not even suggested that Goodfarb led him to believe he was to communicate with Goodfarb through Fallon or the corporate defendants.

---

**8.** Fallon testified that Goodfarb only participated in "major" decisions regarding the two companies. Fallon Deposition, pp. 25–26. While he did not describe what he meant by a "major" decision, the termination of plaintiff's employment could fall into this category.

**9.** Further support for our conclusion may be found in Goodfarb's and Eastern's tax returns, which indicate that Goodfarb was compensated for his employment with Eastern. While Goodfarb maintains he was primarily involved in operating Verdi during his incarceration, he has not explained why the tax returns characterize his compensation in this manner. Although the record does indicate that most companies owned and/or controlled by Goodfarb were operated through Eastern, it does not specifically indicate the relationship between Eastern and Verdi. Nor is there evidence as to whether wages paid to employees of Eastern's affiliates were denominated as wages for services rendered to Eastern or to the affiliate, or whether Goodfarb's wages for services on behalf of the various companies was ordinarily allocated among the different companies. Goodfarb may, of course, have traditionally been compensated through, and in the name of, Eastern. On the present record, however, and giving all reasonable inferences to the plaintiff, we must hold that a jury could find these payments were for services rendered to Eastern.

Both of these factors are designed to determine the extent to which the plaintiff may have excusably neglected to include the unnamed party. As the *Glus* court observed, it is unreasonable to expect the complainant, who is usually not assisted by counsel at the time an EEOC charge is filed, to foresee all those who might potentially have been responsible for the discrimination. *Glus*, 562 F.2d at 888. Here, however, despite his assertion that Goodfarb makes, and always has made, all decisions of consequence involving the defendant corporations—and his belief at the time he filed his EEOC charge that Goodfarb participated in the challenged decisions—plaintiff has proffered no reason for not naming Goodfarb in the EEOC charge. This unexplained failure presents a different situation than typically encountered when an unnamed party is sued. While plaintiff correctly notes that no one prong of the four-part test is determinative, *see Glus v. G.C. Murphy Co.*, 629 F.2d 248, 251 (3d Cir.1980) (Glus II), *vacated on other grounds sub nom., Retail, Wholesale & Department Store Union, AFL–CIO v. G.C. Murphy Co.*, 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981), the absence of a reasoned basis for not naming a party in an EEOC charge whose involvement is then known is surely of great significance. Indeed, even while announcing the above considerations, the *Glus* court stated "we do not suggest that where it can reasonably be expected full compliance will not be required." *Glus*, 562 F.2d at 888.

Nor is this a case where the charges' factual statements are sufficient to put the unnamed party and the EEOC on notice of his alleged role in the discrimination. Each of plaintiff's charges has sixteen numbered paragraphs and the only individual either refers to is defendant Fallon. Given Goodfarb's incarceration at the time, and Fallon's representation that Goodfarb played no part in any decisions affecting the plaintiff, the EEOC investigation could not have been reasonably certain to ascertain Goodfarb's alleged participation. Indeed, it appears Goodfarb was never contacted by the EEOC. Goodfarb Affidavit ¶¶ 2, 3. We therefore cannot conclude that the charges

themselves were "sufficient to notify the EEOC of the charges against [Goodfarb], and to enable the EEOC to give proper notice to [Goodfarb], investigate the charges, and to attempt to resolve the dispute prior to litigation." *Acampora v. Boise Cascade Corp.*, 635 F.Supp. 66, 71 (D.N.J.1986); *cf. Pao v. Holy Redeemer Hospital*, 547 F.Supp. 484, 495 (E.D.Pa. 1982) (where factual allegations of EEOC charge stated a hospital's Board of Directors had acted discriminatorily, individual Board members were thereby put on notice and were subject to suit).

Plaintiff, however, asserts Goodfarb actually had notice of the charge. He bases this on the evidence of Goodfarb's contact with the company, his claimed contacts with Herring, and the fact that the EEOC charge was mailed to the "Chief Executive Officer" of the corporate defendants. Even accepting plaintiff's contentions, Goodfarb would only have been aware of plaintiff's claim that Fallon and the corporate defendants had discriminated against him. Goodfarb would not have had notice that he was also being charged with discrimination, nor of the possibility that he could be subject to suit.

Turning to the other two *Glus* factors, plaintiff urges that "Goodfarb's interests were similar enough to the corporate entities that did participate in conciliation proceedings" to avoid any prejudice. Plaintiff's Memorandum, p. 21. As support, he relies on *Acampora, supra,* and *Bumpers v. International Mill Services, Inc.*, 595 F.Supp. 166 (E.D.Pa.1984). In *Acampora,* Judge (now Chief Judge) Gerry of this Court found that where the body of the EEOC complaint named an employee and alleged that he engaged in discriminatory conduct while acting within the scope of his employment his interests could be adequately represented by his employer. Thus, during the course of the EEOC investigation, it was known that the employee's actions were considered to be discriminatory. Here, in contrast, the corporate defendants could not have represented Goodfarb against discrimination claims since his actions were not in issue. Similarly,

*Bumpers* is inapposite. There, the plaintiff maintained a parent corporation had ordered its subsidiaries to reduce costs by discharging older employees. Plaintiff also claimed he informed the EEOC of this and of his contention that the parent exercised greater control over its subsidiaries than typically found in such relationships. Taking these allegations as true, the court rejected the parent corporation's argument that it must be dismissed because the plaintiff named only the subsidiaries in his EEOC complaint. *Bumpers,* 595 F.Supp. at 170–71. Again, unlike the instant case, the unnamed party's actions were before the EEOC and a named party could, therefore, adequately represent its interests. Nor are we persuaded that Goodfarb's ownership interest in the defendant corporations establishes the requisite commonality of interest. As Goodfarb notes, this lawsuit seeks to impose personal liability on him. While he undoubtedly has an interest in minimizing the corporations' potential losses, this may not be coextensive with his interest in avoiding personal liability. Thus, even if he had notice of the EEOC charge, since it did not put him on notice of his amenability to suit we cannot find his interests to be so similar to the corporate defendants' that "it would be unnecessary to include [him] in the EEOC proceedings." *Glus,* 562 F.2d at 888. Similarly, the corporations' interest in minimizing their losses are sufficiently distinct from Goodfarb's interest in minimizing his personal losses that the corporations' participation in the EEOC proceedings cannot be deemed to have obviated the need to include Goodfarb in the EEOC process.

Finally, plaintiff maintains that the third *Glus* factor—whether the unnamed party has suffered actual prejudice—cuts in his favor. He claims Goodfarb's inclusion in the EEOC complaint would have made little difference, since the corporate defendants' position was that plaintiff left his employment voluntarily, *see* Plaintiff's Memorandum, p. 23 and Exhibit H, and since Goodfarb denies any involvement in the matter. Plaintiff also notes that no conciliation discussions were held. Goodfarb, on the other hand, contends that had he known of his potential personal liability he would have had a strong incentive to try to settle this matter through conciliation.

It is, of course, impossible to predict whether the EEOC proceedings would have been different had Goodfarb known he was subject to personal liability. His posture in this litigation, and the corporate defendants' position before the EEOC, suggest they would not. To rely solely on these factors, however, would be to seriously undervalue the salutary role of the EEOC proceedings. By affording an opportunity to resolve the dispute without resort to litigation, they permit the parties to attempt to reach a settlement before their positions become entrenched. Thus, offers which would be unacceptable once litigation is commenced may well form the basis of compromise in the early stages of the controversy. Since we agree that the specter of personal liability would have given Goodfarb a strong incentive to try to settle this matter through conciliation, we cannot be certain that his omission from the EEOC charge did not cause him actual prejudice. While this prejudice cannot be quantified, and may not be great, if the third *Glus* factor supports plaintiff's position at all, it does not do so to the extent he maintains. Balancing it against the other three factors, which counsel against exercising jurisdiction, we conclude that Goodfarb is entitled to summary judgment on Count IV of the complaint.[10]

10. Plaintiff states the defendant corporations are in bankruptcy and that he will be left remediless unless he is permitted to maintain his age discrimination action against Goodfarb. Plaintiff's Memorandum, p. 23. No evidence is offered to support these assertions. Defendants admit the reorganization status of Aetna, but contend it continues to operate and pay its creditors. They also claim that "Eastern, which paid Plaintiff's salary while he was employed by the company, is neither insolvent nor involved in any bankruptcy proceedings. It is a viable corporate entity." Defendants' Reply Memorandum, p. 16. Absent any evidentiary showing that plaintiff would be unable to obtain relief against the corporate defendants, we need not consider if this would affect our analysis.

Next, Goodfarb moves for summary judgment on plaintiff's claim for intentional interference with an economic relationship.[11] He does not dispute that a corporate officer may be held liable for interfering with another's contract with the corporation if the officer acts maliciously or for personal reasons. *See*, Defendants' Reply Memorandum, pp. 17–19; *see also*, *Mayer v. Development Corp.*, 541 F.Supp. 828 (D.N.J.1981), *aff'd without opinion*, 688 F.2d 822 (3d Cir.1982); *O'Connor v. Harms*, 111 N.J.Super. 22, 266 A.2d 605 (App.Div.), *certif. denied*, 57 N.J. 137, 270 A.2d 40 (1970). Rather, he claims plaintiff is precluded from making such an argument by the following averment in his complaint:

> [Fallon and Goodfarb] fired plaintiff from his position with the defendant corporations. *At that time, defendants Fallon and Goodfarb were acting in their capacities as officers of the defendant corporations and acting on behalf of said corporations as agents and/or employees thereof.*

Defendants' Reply Memorandum, p. 18 (quoting paragraph 16 of plaintiff's Complaint; emphasis supplied by defendants).

In *Giannone v. United States Steel Corp.*, 238 F.2d 544 (3d Cir.1956), the Third Circuit addressed the question of judicial admissions. After noting that most authorities deem statements in pleadings to be probative and admissible, the Court expressed some reservations as to this approach:

> Authorities rarely articulate what we believe to be a conflict between the admissions through pleading rule and Rule 8(e)(2) of the Federal Rules of Civil Procedure, 28 U.S.C., which allows inconsistent, alternative and hypothetical pleading. The rules encourage parties to plead not only what they know is factually true, but also any fact if they believe 'there is good ground to support it' *See* Fed.R.Civ.P. 11. This soundly based policy—*see* Clark, Code Pleading §§ 41, 42, 99 (2d ed. 1947)—would tend to be defeated if allegations in the pleadings are admissible as evidence. Parties will hesitate to make notice-giving allegations at the risk of their being used as evidence, especially considering Fed.R.Civ.P. 15 liberalizing amendments.

*Id.* at 547–48. It found resolution of this conflict to be unnecessary, however, since "[b]earing in mind that legal conclusions are not admissions," none of the assertions in the pleadings could reasonably be construed as admissions. *Id.* at 548.

Here, there are several difficulties with binding plaintiff to the language of his complaint. First, whether the individual defendants were acting within the scope of their employment is not something which would necessarily be known by the plaintiff. Unlike matters peculiarly within his knowledge, this would appear to be a "fact" which he believes "there is good ground to support." *Id.* (quoting former Rule 11, Fed.R.Civ.P.). Second, the averment is not purely factual in nature. Whether an employee is acting within his corporate capacity requires an application of legal principles to potentially complex factual patterns. Thus, while the averment may contain certain assumptions as to the underlying facts, it is more in the nature of a legal conclusion, and does not, therefore, constitute an admission. *Id.*

Finally, the approach advocated by the defendants differs in an important way from the typical use of judicial admissions.

---

**11.** All defendants have moved for summary judgment on this count. Plaintiff, however, does not appear to seek relief against the corporate defendants. *See* Plaintiff's Memorandum, p. 17 ("the basis for Plaintiff's claim of intentional interference with an economic relationship is that Goodfarb interfered with Borecki's relationship with Eastern, a corporation"). To the extent Count II of his complaint does assert a claim against the corporate defendants, they are entitled to summary judgment. A claim for interference with contractual relations requires a showing that the person to be held liable interfered "with the contract of another." *Harris v. Perl*, 41 N.J. 455, 461, 197 A.2d 359 (1964); *Leslie Blau Co. V. Alfieri*, 157 N.J.Super. 173, 384 A.2d 859 (App.Div.), *certif. denied*, 77 N.J. 510, 391 A.2d 523 (1978). Thus, a corporation may not interfere with its contractual relationship with its own employee. *E.g.*, *Cappiello v. Ragen Precision Industries, Inc.*, 192 N.J.Super. 523, 529, 471 A.2d 432 (App.Div.1984); *Borbely v. Nationwide Mutual Insurance Co.*, 547 F.Supp. 959 (D.N.J.1981).

The benefit of judicial admissions, of course, is that when a party concedes the truth of some alleged fact it "is thereafter to be taken for granted" and there is no need for evidence to be adduced on the point. 9 Wigmore, *Evidence* § 2588 (Chadbourn rev. 1981). Here, defendants essentially argue that if plaintiff successfully shows Goodfarb participated in the decision he may not then argue that Goodfarb did so outside the scope of his employment. Yet, the facts which will be adduced to prove whether, and to what extent, Goodfarb participated in the decision will, in large measure, form the basis for determining if he acted within the scope of his employment. Use of the "admission" in plaintiff's complaint will, therefore, yield little of the benefits ordinarily associated with a judicial admission. Moreover, evidence admitted to prove Goodfarb's participation might establish that he acted outside the scope of his employment—contradicting the "fact" conclusively established by the "judicial admission." Thus, even were we to conclude that the averment constitutes a judicial admission, we would decline to allow defendants to obtain its benefits in the manner they propose.[12]

Since the only other argument Goodfarb has advanced in support of his motion for summary judgment on plaintiff's claim for intentional interference with contractual relations is that he was not involved in the decision—a contention we cannot endorse when viewing the facts most favorably to the plaintiff—his motion shall be denied as to Count II of the complaint.

■ Next, Goodfarb moves for summary judgment on plaintiff's claim for wrongful discharge. In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), the New Jersey Supreme Court outlined a narrow exception to the employment at will doctrine. The Court noted that in doing so:

> we must balance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

*Id.* at 71. Accordingly, it concluded that an employee could maintain a cause of action "in contract or tort or both" only if he was discharged "contrary to a clear mandate of public policy." *Id.* at 72. This standard, the court believed, was sufficiently stringent to discourage vexatious suits. Thus, "[i]f an employee does not point to a clear expression of public policy, the court can grant a motion to dismiss or for summary judgment." *Id.* at 73.

In seeking summary judgment, Goodfarb does not maintain that an absence of a clear expression of public policy bars plaintiff's claim. Rather, he contends there is no indication in *Pierce, supra*, or any other New Jersey decision, "that an individual who is not an employer may be liable for a tortious termination of employment." Defendants' Brief, p. 17. Since the New Jersey Supreme Court has not spoken to whether such an individual may be sued for wrongful discharge, we must attempt to predict if it would permit plaintiff's claim against Goodfarb to proceed. *Lang v. New York Life Ins. Co.*, 721 F.2d 118 (3d Cir. 1983); *Erie Castings Co. v. Grinding Supply, Inc.*, 736 F.2d 99 (3d Cir.1984).

---

12. In a sense, defendants seek to split up the "admission" and bind plaintiff to only one portion of it. Thus, they deny Goodfarb acted at all—and are prepared to offer proof in support of their position—yet seek to have plaintiff bound by the statement that Goodfarb was acting within the scope of his employment. The difficulties noted in the text might arise not only because the claimed admission is not purely factual in nature, but also because of the interrelationship of the parts of the "admission." Were defendants willing to be bound by, and bind plaintiff to, the entire averment on all counts of the complaint, these problems would be eliminated. At most, however, they appear to be willing to do so only on Count II of the complaint.

Of course, we express no opinion on whether plaintiff could successfully seek to amend his complaint, the effect, if any, of the averment in paragraph 16 of his complaint should such an amendment be permitted, or on any other question relating to this averment.

While decisions of the intermediate New Jersey courts are to be given "proper regard," *Erie Castings Co., supra*, 736 F.2d at 100, they offer little guidance here. In most decisions applying *Pierce*, the claim for wrongful termination was not asserted against an individual. *See e.g., Lally v. Copygraphics*, 173 N.J.Super. 162, 413 A.2d 960 (App.Div.1980), *aff'd*, 85 N.J. 668, 428 A.2d 1317 (1981); *Kalman v. Grand Union Co.*, 183 N.J.Super. 153, 443 A.2d 728 (App.Div.1982); *Crowell v. Transamerica Delaval, Inc.*, 206 N.J.Super. 298, 502 A.2d 573 (Law Div.1984); *Warthen v. Toms River Community Mem. Hosp.*, 199 N.J.Super. 18, 488 A.2d 229 (App.Div.), *certif. denied*, 101 N.J. 255, 501 A.2d 926 (1985). Courts considering such cases, therefore, had no occasion to discuss whether an employee responsible for the termination could be liable under *Pierce*.

Cases in which an individual defendant was joined are also not instructive. Thus, in *Slohoda v. United Parcel Service, Inc.*, 193 N.J.Super. 586, 475 A.2d 618 (App.Div. 1984), plaintiff brought an action against his employer and several of its management employees. The first count asserted he was discharged due to his marital status in violation of several New Jersey statutes, *Id.* at 588, 475 A.2d 618, the fifth count alleged retaliatory discharge, and the sixth sought relief for defendants' "violation of 'public policy.'" *Id.* at 593, 475 A.2d 618. After reversing an order granting defendants summary judgment on count one, the court found a remand appropriate on the last two counts of the complaint "because at the present time there is no judicial determination on counts five and six for us to review." *Id.* at 594, 475 A.2d 618. Accordingly, even though the use of the word "defendants" throughout the opinion suggests the claims for wrongful termination were asserted against at least one of the individual defendants, the court did not pass on the viability of such claims. The same is true of *Cappiello v. Ragen Precision Industries, Inc.*, 192 N.J.Super. 523, 471 A.2d 432 (App.Div.1984). There, an order entered on a jury verdict found defendants had terminated plaintiff's employment "maliciously and wrongfully so as to deprive him of a financial benefit." *Id.* at 526, 471 A.2d 432. The Appellate Division, however, rested its affirmance not on a theory of wrongful termination, but on plaintiff's allegation of malicious interference with contractual rights. *Id.* at 529–30, 471 A.2d 432.[13]

Absent controlling or instructive precedent we turn to a consideration of the principles enunciated in *Pierce*. We begin by noting that the exception to the employment at will rule recognized in that case is a narrow one. *See, Blum v. Witco Chemical Corp.*, 829 F.2d 367, 377 (3d Cir.1987). The *Pierce* court, however, expressly noted that requiring a plaintiff to demonstrate a violation of a "clear mandate of public policy" would adequately discourage groundless suits by permitting courts to dismiss such claims prior to trial. *Pierce, supra*, 84 N.J. at 73, 417 A.2d 505; *see e.g., Giudice v. Drew Chemical Corp.*, 210 N.J.Super. 32, 509 A.2d 200 (App.Div.) (noting propriety of entry of summary judgment on behalf of employer under *Pierce*, but reversing in part on different grounds), *certif. granted and remanded*, 104 N.J. 465, 517 A.2d 448 (1986); *Galante v. Sandoz, Inc.*, 192 N.J.Super. 403, 470 A.2d 45 (Law Div.1983) (granting employer's motion for summary judgment). Finding Godfarb to be amenable to a suit for wrongful discharge would, of course, do nothing to expand the type of termination which would give rise to liability. Courts, applying the same standard set forth in *Pierce*, would still be free to dispose of meritless

---

**13.** In *Alexander v. Kay Finlay Jewelers, Inc.*, 208 N.J.Super. 503, 506 A.2d 379 (App.Div.), *certif. denied*, 104 N.J. 466, 517 A.2d 449 (1986), the plaintiff sued his employer and the estate of its sole stockholder for wrongful discharge. When it was established that the sole stockholder had acted as the company's agent, the count against the estate was dismissed. *Id.* at 506, n. 2, 506 A.2d 379. The lower court then summarily dismissed the complaint against the corporation and the Appellate Division affirmed, finding the discharge did not violate a clear mandate of public policy. The lower court's ruling does not indicate that a cause of action would lie against the individual decisionmaker, but rather appears to be based on familiar principles of liability governing agency relationships.

claims on motions to dismiss or for summary judgment. The only impact would be to widen the number of people who could be sued under an otherwise valid claim of wrongful discharge. Concern over who could be sued was simply not a factor which motivated the New Jersey Supreme Court to narrow the cause of action for wrongful discharge. Thus, permitting plaintiff to sue Goodfarb for wrongful discharge would not necessarily expand the action in a manner inconsistent with that court's pronouncements.

Indeed, a balancing of the competing interests identified in *Pierce* supports allowing plaintiff's claim to proceed against Goodfarb. An employee's interest in knowing he will not be discharged for exercising his legal rights will be furthered if the individual responsible for the decision, as well as their common corporate employer, is amendable to suit. The typical decisionmaker contemplating the wrongful discharge of a subordinate would then need to consider not only the adverse employment consequences which he would incur from a lawsuit against his corporate employer, but also the possibility that he would be amenable to suit. Where, as here, the decisionmaker has a substantial ownership interest in the corporations, the operative incentives are somewhat different. In such cases, the likelihood that the decisionmaker's employment situation will be adversely affected may be remote. Thus, if he is not amenable to suit, his primary incentive not to wrongfully discharge an employee will be his interest in avoiding the imposition of liability on the corporation. As we have noted, the possibility that he could be sued in his own name may well cause him to act significantly differently than if he believed only the corporation could be sued. *See supra*, p. 55. Permitting plaintiff's claim to proceed against Goodfarb would, therefore, provide an additional deterrent to the wrongful discharge of employees and would thereby further employees' interests.

Nor would the public interest in employment stability and in discouraging baseless litigation be offended by permitting Goodfarb to be sued. As we have noted, the high threshold showing which a plaintiff must make is an adequate safeguard to meritless lawsuits. To the extent permitting this lawsuit to be maintained will deter the wrongful discharge of employees, of course, the interest in employment stability will thereby be promoted.

Finally, we must consider employers' interest in "knowing they can run their business as they see fit as long as their conduct is consistent with public policy." *Pierce, supra*, 84 N.J. 58, 71, 417 A.2d 505. Allowing the decisionmaker to be sued may not only benefit employees through the deterrent effect noted above, but may also benefit employers. By discouraging decisionmakers from discharging employees for improper reasons—reasons which might have no relationship to the value of the employee to the employer—employers' liability for wrongful discharges will be lessened. While the decisionmaker's fear of litigation may arguably make him wary of taking appropriate measures in furtherance of the employer's objectives, the limited scope of wrongful discharge actions will serve to minimize any adverse impact to the employer. Balancing these factors, we believe that the New Jersey Supreme Court would find that plaintiff's claim against Goodfarb is consistent with the cause of action recognized in *Pierce*.

Support for permitting Goodfarb to be sued for wrongful discharge may also be found in general principles of tort law. In *Harless v. First National Bank*, 169 W.Va. 673, 289 S.E.2d 692 (1982), the West Virginia Supreme Court noted that a "[wrongful] discharge serves to fix responsibility on the employer but this does not mean that the employee who has been the principal protagonist in obtaining [another] employee's discharge would not also be liable." *Harless*, 289 S.E.2d at 698. In holding that the employee responsible for obtaining the discharge could be held liable, the Court relied on the fact that:

> An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employment relationship. Of course, if he is

acting within the scope of his employment, then his principal or employer may also be held liable.

*Id.* at 699 (quoting *Musgrove v. Hickory Inn, Inc.,* 168 W.Va. 65, 281 S.E.2d 499 (1981)); *see also, Murphy v. Topeka–Shawnee County Dept. of Labor,* 6 Kan.App.2d 488, 630 P.2d 186 (1981) (governmental immunity does not extend to supervisor who allegedly wrongfully discharged employee). Similarly, under New Jersey law an agent is liable for his tortious acts, even if his principal is also liable. *See, Moss v. Jones,* 93 N.J.Super. 179, 225 A.2d 369 (App.Div. 1966); *McFadden v. Turner,* 159 N.J.Super. 360, 388 A.2d 244 (App.Div.1978).

Moreover, where, as may be the case here, the decisionmaker is an active participant in the decision to wrongfully terminate another's employment, permitting him to be sued is not unfair. Only if, at a minimum, the discharge violated a "clear mandate of public policy," *Pierce, supra,* 84 N.J. at 72, 417 A.2d 505, would he be amenable to suit. Assuming the decisionmakers' interests, like those of their employers, is in being able to perform their functions "as they see fit as long as their conduct is consistent with public policy," *id.* at 71, 417 A.2d 505, where a decisionmaker is a key protagonist in obtaining an employee's wrongful discharge his actions are not worthy of protection. Such conduct can safely be said to be inconsistent with public policy.[14]

We remember also the historical evolution of the employment at will doctrine. As the *Pierce* court observed,

[i]n the last century the common law developed in a laissez-faire climate that encouraged industrial growth and approved the right of an employer to control his own business, including the right to fire without cause an employee at will. The twentieth century has witnessed significant changes in socio-economic values that have led to reassessment of the common law rule.... Growth in the number of employees has been accompanied by

increasing recognition of the need for stability in labor relations.

*Pierce, supra,* 84 N.J. at 66, 417 A.2d 505 (citation omitted). Thus, the employment at will doctrine was essentially a protection for the employer, granted to further larger social aims. Where that protection is no longer found to be appropriate in certain situations, its previous existence is not itself a compelling reason for precluding suits in those limited situations against one who may have been a key participant in improperly obtaining the employee's discharge.

Given the above considerations, we believe the New Jersey Supreme Court would permit plaintiff to maintain a claim for wrongful discharge against Goodfarb. We emphasize the narrowness of this holding. We deal only with the specific facts of this case—an alleged wrongful discharge which may have been made for personal reasons by one who historically controlled the corporate defendants, and who was at least their dominant, if not sole, shareholder. Cognizant of our limited role as a federal court interpreting New Jersey law and in attempting to predict how the New Jersey Supreme Court would answer the question before us, we do not pretend to decide the extent to which employees may be sued for wrongful discharge. We hold only that on the facts presented, the New Jersey Supreme Court would allow plaintiff's tort claim against Goodfarb to proceed.

■ Lastly, defendants argue summary judgment should be entered in their favor on Count III of the complaint, urging that a termination of employment, standing alone, cannot support a claim of intentional infliction of emotional distress. New Jersey courts, applying the standards of the Restatement (Second) of Torts § 46, have imposed liability for this tort "where the conduct exceeded all bounds usually tolerated by decent society and where the actions are especially calculated to cause and do cause mental distress of a very serious kind." *Porta v. Rollins Environmental,*

---

**14.** We need not, and do not, consider whether, and under what circumstances, the same could

be said for one whose role is more limited.

654 F.Supp. 1275, 1285 (D.N.J.1987) (quoting *Hume v. Bayer*, 178 N.J.Super. 310, 315, 428 A.2d 966 (App.Div.1981)), *aff'd without opinion*, 845 F.2d 1014 (3d Cir. 1988). As this language suggests, the reach of the tort is narrow:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46, comment d.

Before submitting such a claim to the jury, the court must first determine whether reasonable minds could conclude that the alleged conduct met this standard. *Id.*, comment h; *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979). Generally, decisions to discharge an employee have not been found to constitute intentional infliction of emotional distress. *See Cautelli v. GAF*, 531 F.Supp. 71 (E.D.Pa.1982) (inducing employee to commit himself to continued employment, when employer knows employee may later be required to relocate failed to state a claim); *Krochalis v. Insurance Co. of North America*, 629 F.Supp. 1360, 1372–73 (E.D.Pa.1985) (citing cases). Where, however, the decision is accompanied, or preceded, by harassing conduct courts have permitted the claim to go to the jury. For example, in *Porta, supra,* we held that where the plaintiff received sexually offensive and threatening letters in her mail box at work, was the subject of crude and demeaning remarks and graffiti, as well as other humiliating treatment by her supervisors prior to her termination, a jury question was presented. Similarly, in *Cory v. Smith Kline Beckman Corp.*, 585 F.Supp. 871 (E.D.Pa.1984) the defendant "[did] not deny that Cory was repeatedly denied promotions, was required to devote considerable time and energy to defending her performance, and ultimately lost her job." *Id.* at 875. The court held that "this *series of events* could form the basis of a jury verdict on a theory of intentional infliction of emotional distress." *Id.* (emphasis supplied). *Accord Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497 (11th Cir.1985) (summary judgment inappropriate where plaintiff testified that supervisors harassed her in effort to have her resign).

Here, plaintiff points to no harassment or pattern of conduct. Instead, he asserts he was instrumental in the growth of the defendant corporations, at considerable personal sacrifice, and was terminated at an age when it would be difficult, if not impossible, to obtain worthwhile employment. He then relies on the allegedly illicit purposes of the termination—retaliation for his "disloyalty" to Goodfarb and age discrimination—in arguing that "[d]efendants' conduct toward [him] was at least as outrageous as the harassment experienced in *Porta.*" Plaintiff's Memorandum, p. 27. We cannot agree. The plaintiff in *Porta* not only complained of a termination motivated by illicit purposes, but also of conduct which "crossed the threshold of decency into a realm of atrocity ... utterly intolerable in a civilized society." *Hooton v. Pennsylvania College of Optometry*, 601 F.Supp. 1151, 1155 (E.D.Pa.1984). The continuing, insulting behavior in *Porta* is clearly distinguishable from the factual scenario presented in this case.

Nor does a review of the case law convince us that defendants' asserted conduct is so "extreme" or "outrageous" as to warrant the imposition of liability for this tort. As indicated above, courts in this circuit have found some sort of harassing behavior to be necessary in addition to the termination of employment. *See supra*, p. 61. Other courts, also applying the Restatement formulation of this tort, appear

**62**

to be in agreement. *E.g., Brezinski v. F.W. Woolworth,* 626 F.Supp. 240, 244 (D.Colo.1986). In addition, courts which have considered terminations of employment taken for discriminatory reasons, but unaccompanied by harassment, have found there could be no recovery for intentional infliction of emotional distress. *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1262 (D.Kan.1984) (plaintiff's claim "boils down to nothing more than defendants having fired her, ostensibly for legitimate reasons, but actually because of her age."); *see Salazar v. Furr's, Inc.,* 629 F.Supp. 1403 (D.N.M.1986) (employee alleged she was terminated because she was pregnant and because her pension benefits were about to vest).[15] As the *Fletcher* court observed:

> the termination of an employee, whatever the secret motive underlying it, is the kind of event that happens every day; such an act is not even a breach of modern-day business etiquette, much less an uncivilized barbarism. Quite a bit more ... must accompany a firing if it is to be deemed 'outrageous.'

*Fletcher,* 585 F.Supp. 1260, 1262; *see also,* Restatement (Second) of Torts § 46, comment d (not enough that conduct motivated by criminal or tortious intent, nor that it was intended to inflict emotional distress). Accordingly, we hold that the conduct alleged here cannot support a claim for intentional infliction of emotional distress and that defendants are therefore entitled to summary judgment on Count III of the complaint.

### CONCLUSION

For the reasons set forth above, summary judgment is granted in favor of defendants Eastern and Aetna on Count II of the complaint, in favor of defendants Eastern, Aetna, and Goodfarb on Count III of the complaint, and in favor of defendant Goodfarb on Count IV of the complaint. The motion for summary judgment is in all other respects denied.

---

15. In several cases in this circuit, plaintiffs have sought relief for both terminations of employment in violation of antidiscrimination statutes and for intentional infliction of emotional distress. *See, Bradshaw v. General Motors,* 805 F.2d 110 (3d Cir.1986) (racial discrimination); *Madreperla v. Williard Co.,* 606 F.Supp. 874 (E.D.Pa.1985) (age discrimination); *Hooten, supra* (sex discrimination). These cases did not, however, explicitly consider whether the discriminatory motive behind the termination could be sufficient to support recovery for intentional infliction of emotional distress.