**Kristy LEMKE, Plaintiff,**

v.

**INTERNATIONAL TOTAL SERVICES, INC. and Dan Richards, Defendants.**

No. Civ.A. 97–5756(MTB).

United States District Court, D. New Jersey.

July 16, 1999.

474

Michael J. Reimer, Reimer & Niedweske, South Orange, NJ, for plaintiff.

Raymond A. Kresge, Diane N. Apa, Klett Lieber Rooney & Schorling, Cherry Hill, NJ, for defendants.

## OPINION

BARRY, District Judge.

Defendants International Total Services, Inc. ("ITS") and Dan Richards ("Richards") (collectively as "defendants") move for summary judgment. Plaintiff Kristy Lemke ("Lemke" or "plaintiff") cross-moves for partial summary judgment as to her claims under the New Jersey Law Against Discrimination ("NJLAD") and Title VII of the Civil Rights Act of 1964. For the following reasons, this court will grant defendants' motion and deny plaintiff's motion.

### I. Background

ITS is a company which contracts with airlines to provide security and other services to airports nationwide. On November 18, 1992, plaintiff was hired by ITS as the General Manager at Washington National Airport. See Am.Compl. ¶¶ 1–2; Weitzel V.S. ¶ 2.[1] In November 1994, she relocated to New Jersey and became a Continental Airlines Terminal Manager for ITS at Newark International Airport. See Pl.Dep. at 217, 402–403.

Plaintiff was a Terminal Manager until April 1996 when she became an acting District Manager. See id. at 219. In 1996, ITS was organized into three divisions—the Eastern, the Central, and the Western Divisions. See id. at 241. By May 1996, plaintiff was the District Manager of the New York Metro Area, a district within the Eastern Division of ITS. See id. at 219; Am.Compl. ¶ 3. In 1996, there were four districts in the Eastern Division: (1) Newark, which was managed by John Pudlak; (2) New York Metro, which included the airports in New York City, Long Island, Baltimore, Washington, Atlantic City, Allentown (Pa.), Boston, Cape seasonal airports and Burlington (Vt.) and was managed by plaintiff; (3) New York State, including Buffalo, Syra-

cuse, Rochester, Albany, Elmira, Ithaca, Binghamton, and Erie (Pa.) managed by Jim Patric; and (4) Southeast, which included Florida, Georgia, the Carolinas and other southeast states managed by Peter Collins. See Richards V.S. ¶ 2;[2] Reimer Cert. dated Feb. 3, 1999, Exh. D. Thus, even though plaintiff remained in Newark after she was promoted to District Manager, Newark was not within her district and, instead, was managed by Pudlak. See Richards V.S. ¶ 5.

Toward the end of 1996, Richards became the Eastern Division President and plaintiff reported to him throughout the remainder of her employment with ITS. See Pl.Dep. at 200. In early 1997, Richards decided to realign the geographic districts in the Eastern Division for a number of reasons: one, districts with "purer, straight East–to–West lines would be more efficient;" two, a realignment of the district managers would "make a stronger business team with more potential for growth;" and, three, it lacked common sense for plaintiff to be a district manager based in Newark when Newark was not within her area of responsibility. See Richards V.S. ¶ 5.

In March 1997, Richards began talking to plaintiff about possible changes in the territory for which she was responsible. See Pl.Dep. at 369. For starters, Richards left plaintiff a voice mail message to the effect of: "I don't know what your personal situation is and would you be interested in possibly relocating." See id. at 370. Richards and plaintiff discussed plaintiff's possible relocation to more of a Mid–Atlantic/Mid–South district in a phone conversation and Richards ultimately provided plaintiff with a colorized map of the geographically reorganized Eastern Division. See id. at 381, 385, 388. The colorized map divided the Eastern Division into four geographic districts: the Northeastern

---

1. The Verified Statement of Robert A. Weitzel is attached as Exhibit B to defendants' Appendix of Exhibits in Support of Motion for Summary Judgment.

2. The Verified Statement of Daniel Richards is attached as Exhibit E to defendants' Appendix of Exhibits in Support of Motion for Summary Judgment.

states, including New York; New Jersey; the Mid–Atlantic states, including Pennsylvania; and the Southern states extending to Florida. *See* Richards Dep., Exh. 1.[3]

Richards met with plaintiff at the Boston airport on April 9, 1997 to discuss plaintiff's possible relocation to a site in the Mid–Atlantic region. *See* Pl.Dep. at 391. Plaintiff told Richards that she was not interested in relocating, *see id.*, and memorialized the meeting in a memorandum to Richards dated April 10, 1997. *See* Reimer Cert. dated Feb. 3, 1999, Exh. B. In the memorandum, plaintiff expressed her concern that the reorganization would cause her to lose areas, including the New York Metro area, which she had worked hard to establish. *See id.* Plaintiff also stated that she felt that her territory was being taken away "because [Richards] want[s] to hire a friend and give him the largest area and revenue base to support a large salary." *See id.* Plaintiff mentioned gender in the memorandum only insofar as she asserted that she was "well aware of the number of female managers in the company that are at the same level that I am, not many." *See id.*

Plaintiff and Richards met again in Newark on April 18, 1997. *See* Pl.Dep. at 419. The parties characterize the meeting somewhat differently, *i.e.* plaintiff asserts that she was fired and defendants assert that she quit, but both sides agree that during the meeting, Richards reiterated that plaintiff's district was being eliminated or "downsized." Richards V.S. ¶ 9; Lemke Aff. ¶ 9; Reimer Aff. dated Feb. 3, 1999, ¶ 14; Pl.Dep. at 426–27. Plaintiff responded by calling Richards "a piece of work." Lemke Aff. ¶ 9; Richards V.S. ¶ 9. Plaintiff left Richards' office but shortly thereafter returned and asked questions about severance pay and money for accrued vacation. *See* Lemke Aff. ¶ 9; Richards Aff. ¶ 9; Pl.Dep. at 422–24. After Richards stated that he would have to look

into her questions, *see* Pl.Dep. at 429, plaintiff collected her personal belongings, wished the employees in the building well, and left the building, never to return. *See id.* at 430. The ITS Hourly Transaction Form, dated April 18, 1997 and signed by Richards, states that plaintiff's last day of employment was April 18, 1997 and the box labeled "Termination" sets forth "Organizational Downsizing" as the reason. Lemke Aff., Exh. E.

Because Richards needed to immediately submit a budget plan for the Eastern Division and because plaintiff had rejected the Mid–Atlantic region, Richards expanded Pudlak's New Jersey territory to include the Mid–Atlantic states. *See* Richards V.S. ¶ 11. Thus, when plaintiff left ITS, there were three district managers: Pudlak, covering New Jersey and the Mid–Atlantic region; Collins, covering the Southern region; and Brian Michel who was hired to cover the Northeastern region, including New York and Boston. *See* Pl.Dep., Exh. D–25. Not long afterwards, Michel resigned and Bruce Watson took over the Northeastern region. On October 2, 1997, plaintiff began working as a full-time second grade teacher at St. Francis School. *See* Pl.Dep. at 99–101.

On August 8, 1997, plaintiff filed a charge of gender discrimination against ITS with the United States Equal Employment Opportunity Commission ("EEOC"). *See* Pl.Dep. at 110–11. On August 22, 1997, plaintiff requested a notice of right to sue from the EEOC and it was issued on August 28, 1997. *See id.* at 118–20 and Exhs. D–11, D–12. Plaintiff simultaneously filed a charge of gender discrimination with the New Jersey Division of Civil Rights ("NJDCR"). *See* Pl.Dep. at 117. Plaintiff never withdrew the charge filed with the NJDCR and the NJDCR has yet to issue a determination on her charge of discrimination. *See id.* at 117–18.

---

**3.** The transcript of Richards' deposition (and the colorized map of the districts) is located at Exhibit D to defendants' Appendix of Exhibits in Support of Motion for Summary Judgment.

On November 24, 1997, plaintiff filed with this court a four-count complaint against ITS and Richards alleging gender discrimination in violation of NJLAD (Count One), gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count Two), and intentional infliction of emotional distress (Counts Three and Four). On January 4, 1999, plaintiff amended her complaint and added Count Five, alleging that defendants violated the Federal Equal Pay Act ("EPA"). Cross-motions for summary judgment followed.[4]

## II. DISCUSSION

Summary judgment may be granted if, after consideration of such items as depositions, affidavits or certifications, and after viewing the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 n. 3 (3d Cir.1994). With this standard in mind, this court will evaluate each of plaintiff's claims.

### A. *Gender Discrimination Claims*

In Counts One and Two of the complaint, plaintiff alleges that defendants violated Title VII and NJLAD, respectively, by discriminating against her on the basis of her gender. Defendants move for summary judgment because: (1) plaintiff has

failed to exhaust the administrative remedies required to bring a Title VII claim; (2) plaintiff's NJLAD claim is barred because she has a charge pending with the NJDCR; (3) plaintiff has failed to set forth a *prima facie* case of gender discrimination under Title VII and NJLAD as she has not shown that she suffered an adverse employment action; and (4) even assuming a *prima facie* case under Title VII and NJLAD, plaintiff has not demonstrated that defendants' reasons for their actions were pretextual. Plaintiff not only opposes defendants' motion for summary judgment but asserts that this is the "very rare" case in which summary judgment should be granted to a plaintiff on her Title VII and NJLAD claims. *See* Pl.Br. at 11.

### 1. *Exhaustion under Title VII*

■ Although plaintiff offers no response to defendants' exhaustion argument, this court will first address whether plaintiff has sufficiently exhausted her administrative remedies such that her Title VII claim is properly before this court. Neither side disputes that plaintiff must file a charge of discrimination with the EEOC and receive a notice of right to sue before she can bring an action in federal court alleging a Title VII violation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (noting that prerequisites to filing Title VII civil action are the timely filing of charges of discrimination with the EEOC as well as receiving the EEOC's statutory notice of the right to sue).

---

**4.** Parenthetically, the motions for summary judgment were technically deficient. First, neither side submitted a statement of disputed or undisputed material facts as required by Local Civil Rule 56.1. *See* Local Civ.R. 56.1 (stating that upon the filing of a motion for summary judgment, "each side *shall* furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue") (emphasis added). Second, Local Civil Rule 7.2(b) states that each brief "shall include a table of contents and a table of authorities and shall not exceed 40 ordinary

typed or printed pages ... excluding pages required for the table of contents and authorities." Local Civ.R. 7.2(b). Plaintiff's brief does not contain a table of contents or authorities, and defendants have submitted, without receiving permission of this court, an overlength moving brief of 45 pages. *See* Local Civ.R. 7.2(b) (providing that "[b]riefs of greater length will only be accepted if special permission of the Judge or Magistrate Judge is obtained prior to submission of the brief"). The parties are advised to consult the civil practice rules in future cases.

Plaintiff did, in fact, file a charge with the EEOC on August 8, 1997. The question here is whether plaintiff's notice of right to sue, requested only fourteen days after the charge was filed and issued only six days later, was premature given that it bypassed the 180–day administrative investigation and conciliation process mandated by Title VII.

Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1) (1994), is the statutory provision governing right to sue notices issued to aggrieved parties and, thus, guides this court's analysis. It provides that the EEOC shall issue a notice of right to sue to an aggrieved party if the charge of discrimination filed with the EEOC is dismissed or 180 days have elapsed without the EEOC filing a civil action or entering into a conciliation agreement. *See* 42 U.S.C. § 2000e–5(f)(1) (1994). Once notified, the aggrieved party has ninety days within which to initiate a civil action against the respondent named in the charge. *See id.*

The EEOC has been given the power to issue procedural regulations in order to "carry out the provisions of [Title VII]." 42 U.S.C. § 2000e–12(a). One such regulation provides that a notice of right to sue may be issued before the 180–day period has expired (an "early" right to sue notice). *See* 29 C.F.R. § 1601.28(a)(2) (1998). Section 1601.28(a)(2) allows the EEOC to issue an early notice of right to sue "any time prior to the expiration of 180 days from the date of filing the charge" provided that an Area Director or other enumerated director certifies that "it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge...."[5] 29 C.F.R. § 1601.28(a)(2) (1998). The EEOC's rationale that regulation was "the legal principle that a party is not required to perform a useless act, i.e., wait for the passage of 180 days when the passage of such time will not accomplish any purpose." *Pearce v. Barry Sable Diamonds*, 912 F.Supp. 149, 154 (E.D.Pa.1996) (citing to 42 Fed. Reg. 47,828, 47,831 (1977)).

Here, plaintiff filed her charge of discrimination with the EEOC on August 8, 1997 and requested a right to sue letter on August 22, 1997 because she wanted to "file a lawsuit in this matter as quickly as possible." Pl.Dep., Exh. D–11. Pursuant to 29 C.F.R. § 1601.28(a)(1), the Area Director, on behalf of the EEOC, issued a notice of right to sue on August 28, 1997— only 20 days after the charge was filed— stating that "[l]ess than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge." *Id.* at D–12. The EEOC immediately terminated its processing of the charge, *see id.*, and plaintiff filed suit in this court on November 24, 1997.

Since September 1977, when 29 C.F.R. § 1601.28(a)(2) was issued, the validity of the regulation has been called into question and has been hotly debated in the courts. *See, e.g.,* Valerie J. Pacer, Case Comment, *The Early Right–To–Sue Letter: Has the EEOC Exceeded its Authori-*

---

**5.** The regulation reads as follows:

When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission may issue such notice ... at any time prior to the expiration of 180 days from the date of filing the charge with the Commission; provided, that the District Director, the Area Director, the Local Di-rector, the Program Director, Office of Program Operations or upon delegation, the Director of Systematic Programs, Office of Program Operations or the Directors, Field Management Programs, Office of Program Operations has determined that it is proba-ble that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect.

19 C.F.R. § 1601.28(a)(2) (1998).

ty? *Henschke v. New York Hospital–Cornell Medical Center, 821 F.Supp. 166 (S.D.N.Y.1993),* 72 Wash.U.L.Q. 757, 766 (1994) (noting the twenty-year split among the courts regarding the early right to sue letter). Some courts have held that 29 C.F.R. § 1601.28(a)(2) contravenes the procedural requirements of Title VII and Congress's intention that 180 days is an appropriate length of time to allow for conciliation of employment disputes while preserving a claimant's right to speedy relief. *See, e.g., Montoya v. Valencia County,* 872 F.Supp. 904 (D.N.M.1994); *Henschke v. New York Hospital–Cornell Med. Ctr.,* 821 F.Supp. 166, 169–71 (S.D.N.Y.1993); *People of State of N.Y. by Abrams v. Holiday Inns, Inc.,* 656 F.Supp. 675, 678–80 (W.D.N.Y.1984); *Mills v. Jefferson Bank E.,* 559 F.Supp. 34, 34–36 (D.Colo.1983); *Spencer v. Banco Real, S.A.,* 87 F.R.D. 739 (S.D.N.Y.1980); *Grimes v. Pitney Bowes, Inc.,* 480 F.Supp. 1381, 1383–85 (N.D.Ga.1979). Other courts, including the only two Circuits to have directly decided this issue,[6] have concluded that the regulation is reasonable, and thus entitled to deference, because it makes little sense that a claimant must sit idly by for 180 days when the EEOC has certified that it is unable to investigate the charge within the prescribed time. *See, e.g., Sims v. Trus Joist MacMillan,* 22 F.3d 1059 (11th Cir.1994); *Brown v. Puget Sound Elec.,* 732 F.2d 726, 729 (9th Cir. 1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985); *Saulsbury v. Wismer & Becker, Inc.,* 644 F.2d 1251, 1256–57 (9th Cir.1980); *Bryant v. California Brewers Ass'n,* 585 F.2d 421, 425 (9th Cir.1978), *vacated and remanded on other grounds,* 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980); *Martinez v. Labelmaster,* 1996 WL 580893 (N.D.Ill. Oct.4, 1996); *Chandler v. Fast Lane, Inc.,* 868 F.Supp. 1138, 1141–42 (E.D.Ark.1994); *Rolark v. University of Chicago Hospitals,* 688

F.Supp. 401 (N.D.Ill.1988); *Cattell v. Bob Frensley Ford, Inc.,* 505 F.Supp. 617, 619–22 (M.D.Tenn.1980).

Perusal of the case law within this Circuit provides little guidance. Although in *dicta* expressing disapproval of the regulation and attempts by claimants to "deliberate[ly] bypass" administrative remedies, the Court of Appeals for the Third Circuit declined to reach the issue of the validity of 29 C.F.R. § 1601.28(a)(2) and the effect of early right to sue notices in *Moteles v. University of Pa.,* 730 F.2d 913, 916–18 (3d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984). Moreover, district courts within this Circuit have reached different conclusions. *Compare DeFranks v. Court of Common Pleas of Fayette County,* 1995 WL 606800 (W.D.Pa. Aug.17, 1995) (rejecting contention that 29 C.F.R. § 1601.28(a)(2) was invalid); *Anjelino v. New York Times Co.,* 1993 WL 170209 at *8 n. 8 (D.N.J. May 14, 1993) (refusing to find that *Moteles* required dismissal even if the plaintiffs deliberately bypassed the EEOC administrative process and obtained right to sue letters pursuant to 29 C.F.R. § 1601.28(a)(2)); *Hooks v. RCA Corp.,* 620 F.Supp. 1, 1–2 (E.D.Pa. 1984) (finding that right to sue letter was properly issued by EEOC pursuant to 29 C.F.R. § 1601.28(a)(2)); *Bey v. Schneider Sheet Metal, Inc.,* 596 F.Supp. 319, 323 (W.D.Pa.1984) (holding that EEOC's issuance of right to sue letter at plaintiff's request, twenty-seven days after receipt of the charge, did not deprive court of subject matter jurisdiction); *with Robinson v. Red Rose Communications, Inc.,* 1998 WL 221028 (E.D.Pa. May 5, 1998) (holding that, despite 29 C.F.R. § 1601.28(a)(1), plaintiff must wait 180 days to satisfy the exhaustion of remedies requirement); *Krause v. Security Search & Abstract Co. of Phila., Inc.,* 1997 WL 528081 (E.D.Pa. Aug.21, 1997) (same); *Pearce v. Barry Sa-*

---

**6.** After acknowledging the split within the courts, the Court of Appeals for the Tenth Circuit failed to reach the issue of the validity of 29 C.F.R. § 1601.28(a)(2), deeming the is-

sue waived due to the defendant's failure to raise it as an affirmative defense. *See Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1228 (10th Cir.1997).

*ble Diamonds,* 912 F.Supp. 149, 151 (E.D.Pa.1996) (noting its inclination to find the regulation invalid). Finally, in 1996, recognizing the "cacophony" within the courts, a district court in the Eastern District of Pennsylvania certified questions concerning the validity of 29 C.F.R. § 1601.28(a)(2) to the Court of Appeals for the Third Circuit but it appears that no answers were furnished. *See Pearce,* 912 F.Supp. at 151.

It is within this morass that this court must address defendants' contention that summary judgment is warranted on plaintiff's Title VII claim because plaintiff's right to sue letter was premature and, thus, that she has failed to properly exhaust her administrative remedies.

■ This court is inclined to agree with the disapproving tenor of the Court of Appeals for the Third Circuit in *Moteles* and the various district courts which have held that the EEOC exceeded its authority in issuing a regulation which allows for early right to sue letters. While this court must defer to the EEOC's interpretation of Title VII in its regulations if "reasonable", *EEOC v. Commercial Office Products, Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988), the EEOC cannot adopt regulations that are inconsistent with Congress's statutory mandate. *See Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

The regulation providing for early right to sue letters, especially as applied in this case, contravenes both the statutory language and the purpose of Title VII. Section 706(f)(1) of Title VII provides in relevant part that:

> If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge ... the Commission has not filed a civil action ... or ... entered into a conciliation agreement ..., the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge....

42 U.S.C. § 2000e–5(f)(1) (1994). The language of Section 706(f)(1) is crystal clear and provides that the EEOC shall issue a right to sue letter only (1) "[i]f a charge filed with the Commission ... is dismissed by the Commission ..." or (2) "if within 180 days from the filing of such charge ... the Commission has not filed a civil action under this section...." 42 U.S.C. § 2000e–5(f)(1). As another court has noted, to accept the position that Section 706(f)(1) does not prohibit the issuance of a notice of right to sue before 180 days would be to "ignore the conditional 'if ...' phrasing of the statute." *Spencer,* 87 F.R.D. at 743 (quoting *Budreck v. Crocker Nat'l Bank,* 407 F.Supp. 635, 639 (N.D.Cal.1976)). Moreover, this reading gives teeth to the intent of Congress seen in the analysis of Section 706(f)(1) in the Conference Report presented to the Senate:

> With respect to cases arising under this subsection, if the Commission: (a) has dismissed the charge, or (b) 180 days have lapsed from the filing of the charge without the Commission ... having filed a complaint under section 706(f), or without the Commission having entered into a conciliation agreement to which the person aggrieved is a party ... the person aggrieved may bring an action in an appropriate district court within 90 days after receiving notification.

118 Cong.Rec. 7166, 7168 (1972). This court agrees with the court in *Spencer* that "[t]his analysis makes clear that occurrence of one of these two events is a necessary—not merely a sufficient—condition for commencement of private civil actions." *Spencer,* 87 F.R.D. at 743.

Yet another provision of Title VII requires the EEOC to investigate the allegations and to either dismiss or attempt to conciliate the complaint. *See* 42 U.S.C. § 2000e–5(b) (1994) (providing, in part, that whenever a charge is filed the EEOC "*shall* make an investigation thereof" and

"*shall* endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion") (emphasis added). The administrative procedures of Title VII were enacted by Congress based on its assumption that "[a]dministrative tribunals are better equipped to handle the complicated issues involved in employment discrimination cases." H.R.Rep. No. 238, 92d Cong., 2d Sess. 2, *reprinted in* 1972 U.S.C.C.A.N. 2137, 2146; *see also Ostapowicz v. Johnson Bronze Co.,* 541 F.2d, 394, 398 (3d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) (noting that "[c]onciliation rather than formal court proceedings remains the preferred method of settling [discrimination] disputes"). Plaintiff's request for a right to sue letter only fourteen days after her charge was filed—and the EEOC's facilitation of this bypass of the administrative process by issuing the letter only six days later—flies in the face of both the plain language of Title VII and Congress's intent that discrimination charges be administratively investigated and at least initially addressed by conciliation attempts rather than civil actions.

Moreover, this court is unmoved by the reasoning of some courts, and the EEOC in issuing the regulation, that with the huge backlog of cases, it would be a "travesty" to make claimants wait 180 days before filing a civil action if the EEOC unilaterally decides that it is unlikely that it will complete the administrative processing within 180 days. *Bryant,* 585 F.2d at 425. Any conciliation efforts—even if abbreviated—could help in the resolution of some employment disputes. More importantly, however, Congress was aware of the EEOC's backlog of cases and possible administrative delay when it established "a ceiling of time—180 days—beyond which a complainant would not have to wait before filing a claim in district court." *Sims,* 22 F.3d at 1063 (citing legislative history of 180–day time period). The 180–day window was "a proper balance between the administrative process and administrative

delay." *Pearce,* 912 F.Supp. at 154. If making claimants wait 180 days "is a 'travesty,' it is one that Congress intended, for it sought to compel attempts to determine or settle Title VII disputes at the agency level before resort to the federal courts." *Spencer,* 87 F.R.D. at 745 (citing to *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)).

■ That having been said, however, the Court of Appeals for the Third Circuit has intimated, and numerous courts have opined, that the Supreme Court's decision in *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) establishes that the 180–day exhaustion period is not jurisdictional (*see, e.g., Moteles,* 730 F.2d at 917; *Sims,* 22 F.3d at 1061; *Pearce,* 912 F.Supp. at 153) and, therefore, is subject to equitable considerations. *Cf. Zipes,* 455 U.S. at 393, 102 S.Ct. 1127. While both the short time frame and plaintiff's representation in her letter to the EEOC that she was seeking an early right to sue letter solely because she wished to "file a lawsuit in this matter as quickly as possible" more than suggest that she was deliberately bypassing the administrative procedures of Title VII, plaintiff was doing what the regulation allowed her to do. Accordingly, it would not be equitable to dismiss plaintiff's Title VII claim, particularly where the regulation she followed has not been found to be invalid in this Circuit. *Cf. DeMatteis v. Eastman Kodak Co.,* 520 F.2d 409, 411 (2d Cir.1975) (stating that "[i]t would be inequitable under such circumstances, and would frustrate the remedial purpose of the Civil Rights Act, to apply the decision of this court so as to bar the claim of a party who filed suit within the period recommended by the administrative body which had been established to help vindicate such statutory rights"). Moreover, given that this case has been pending in this court for over a year and a half and is essentially ready for trial, and given this court's determination regarding the merits of plaintiff's Title VII claim, *see infra,*

staying this action while plaintiff returns to the EEOC for administrative investigation and conciliation efforts during the requisite 180–day window would serve no useful purpose. .

#### 2. *Statutory Election of Remedies under NJLAD*

■ Moving to the administrative scheme surrounding plaintiff's NJLAD claim—a scheme which plaintiff also fails to address in her brief [7]—defendants argue that plaintiff's NJLAD claim fails as a matter of law because she admittedly never withdrew the administrative complaint she filed with the NJDCR and the complaint was still pending when she filed this lawsuit. Accordingly, defendants argue, plaintiff's NJLAD claim is barred because N.J.S.A. § 10:5–27 provides that the administrative process with the NJDCR shall be exclusive while pending.

The administrative requirements for a NJLAD claim differ greatly from the procedural requirements under Title VII— most notably, exhaustion of administrative remedies is not required. Indeed, N.J.S.A. § 10:5–13 provides that an aggrieved party may either file a discrimination claim with the NJDCR or initiate a formal civil action. See N.J.S.A. § 10:5–13 (1993). Those alternate remedies, however, are mutually exclusive and N.J.S.A. § 10:5–27 provides that: "the [administrative] procedure herein provided shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned." N.J.S.A. § 10:5–27 (1993). This does not mean, however, that plaintiff's NJLAD claim is barred.

Plaintiff filed a charge of discrimination with the NJDCR on August 8, 1997. See Pl.Dep. at 117. As defendants point out, plaintiff admitted during her deposition

that she never withdrew the complaint and that the NJDCR did not issue a determination or a decision on her charge of discrimination. See id. at 117–18. What defendants fail to acknowledge, however, is that during her deposition, plaintiff also testified—and defendants do not dispute— that she received a letter from "the State" within sixty days of the November 23, 1998 deposition, saying that the New Jersey Division on Civil Rights had closed her case. Id. Defendants gloss over this portion of the deposition arguing, rather, that plaintiff's NJLAD claim is barred because her administrative complaint "was still pending before the NJDCR *as of the time that she filed her lawsuit in this case.*" Def.Br. at 34 (emphasis added).

Although defendants' argument may have been plausible at one time, see *Aldrich v. Manpower Temp. Services,* 277 N.J.Super. 500, 505, 650 A.2d 4 (App.Div. 1994) (holding that N.J.S.A. § 10:5–27 does not jurisdictionally prevent plaintiff from filing a civil action "*after* withdrawing the administrative complaint before final disposition") (emphasis added), *certif. denied,* 139 N.J. 442, 655 A.2d 445 (1995), it is undeniably foreclosed by the recent opinion of the Supreme Court of New Jersey in *Wilson v. Wal–Mart Stores,* 158 N.J. 263, 729 A.2d 1006 (1999). In *Wilson,* the Court rejected what it deemed to be the "arbitrary result[ ]" that a plaintiff who withdrew his or her NJDCR complaint before filing a civil action in Superior Court could proceed, while a plaintiff who withdrew his or her NJDCR complaint after the civil action was filed could not. *Id.* at 270–71, 729 A.2d 1006. The Court held that the exclusivity provision of NJLAD, namely N.J.S.A. § 10:5–27, did not bar a NJLAD action brought in state court even though the plaintiff failed to withdraw her NJDCR complaint until *after* the complaint was filed in Superior Court.

---

7. Plaintiff has not only failed to address numerous issues raised by defendants, but she has submitted a single brief which apparently is meant to serve as her moving brief for summary judgment, her opposition brief to defendants' motion for summary judgment, and her reply brief to defendants' opposition.

*Id.* at 271, 729 A.2d 1006. The Court reasoned that because the NJDCR was not actively investigating the case, the parties were not involved in discovery, and the NJDCR had not rendered an administrative ruling, the purpose of the exclusivity provision was not thwarted by allowing the plaintiff to proceed with her civil action even though her NJDCR complaint was withdrawn after the action was filed. *Id.*

Likewise, here, there is no evidence that extensive, or even any, discovery or investigation took place at the NJDCR, the NJDCR has "closed" plaintiff's case, and it is undisputed that no final determination was ever reached. Thus, plaintiff is not running afoul of the exclusivity provision of N.J.S.A. § 10:5-27 and her NJLAD claim is properly before this court.

### 3. Merits of Plaintiff's Title VII and NJLAD Claims

■■■ Defendants also argue that, even if properly before this court, plaintiff's Title VII and NJLAD claims must fail on the merits. Both sides acknowledge that this case involves discrimination claims based upon circumstantial, rather than direct, evidence and, therefore, that the burden shifting approach set forth in *McDonnell Douglas* applies.[8] The Supreme Court in *McDonnell Douglas* enunciated the three-step process by which to analyze the shifting burdens applicable to such employment discrimination cases:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (summarizing test enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) (citations omitted).

Within this context, defendants may prevail on their summary judgment motion if they can show either that: (1) plaintiff has raised no genuine issue of material fact as to one or more of the elements of a *prima facie* case of employment discrimination; or (2) defendants have presented legitimate non-discriminatory reasons for the adverse employment action to which plaintiff points and plaintiff has not raised a genuine issue of material fact as to whether the reasons proffered are a mere pretext for gender discrimination. *See Cherchi v. Mobil Oil Corp.,* 693 F.Supp. 156, 161 (D.N.J.1988).[9] Defendants argue that they have shown both (1) and (2).

This court need not decide whether plaintiff has set forth a *prima facie* case of discrimination based upon her gender. Rather, assuming that plaintiff has done so and, thus, has shown that she is a member of a protected class, that she was qualified for her position with ITS, that she suffered an adverse employment action as a result of defendants' actions, and that defendants either retained, or replaced plaintiff with,

---

**8.** Neither side asserts that plaintiff's NJLAD claim is subject to a different analysis than her Title VII claim and, therefore, this court will not differentiate between the claims. *See Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 595, 538 A.2d 794 (1988) (adopting *McDonnell Douglas* burden shifting analysis for NJLAD claims).

**9.** *Cherchi,* and other cases that may be cited in this opinion, do not involve discrimination under Title VII or NJLAD but age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. The burden shifting analysis, however, is the same. *See Marzano v. Computer Science Corp., Inc.,* 91 F.3d 497, 503 n. 2 (3d Cir. 1996); *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 n. 10 (3d Cir.1994).

someone from outside the protected class, *see Marzano,* 91 F.3d at 503; *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995), plaintiff's Title VII and NJLAD claims must fail because she has failed to show that there is a genuine issue of material fact as to whether defendants' proffered legitimate reasons for its actions are pretextual. In other words, although the parties dispute whether plaintiff was terminated or simply quit when ITS was reorganized, no party disputes that, upon reorganization, defendants eliminated plaintiff's district in the New York Metro area and asked whether she would relocate as a district manager for the Mid–Atlantic region. Plaintiff declined this transfer and subsequently left ITS. Whether this court construes defendants' actions vis-a-vis plaintiff as a straight termination, a reduction in force, a constructive discharge, or simply a transfer which qualifies as an adverse employment action, defendants have presented nondiscriminatory legitimate reasons for their actions which plaintiff has not adequately refuted.

Moving straight to defendants' second argument, under *McDonnell Douglas* and its progeny, once a *prima facie* case is established, defendants must come forth with legitimate nondiscriminatory reasons for their actions. *See Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.*

Defendants have more than met this "relatively light" burden. *Id.* Indeed, defendants have advanced numerous reasons in support of their decision to reorganize the districts in the Eastern Division of ITS

and to relocate plaintiff. First, defendants have provided a verified statement from the President of ITS, Robert Weitzel, which states that he made clear to Richards in 1996 that the performance of the Eastern Division needed improvement. *See* Weitzel V.S. ¶ 9; Richards V.S. ¶ 5. Weitzel told Richards that he viewed plaintiff and another district manager, Patric, to be the weaker district managers in the Eastern Division. *Id.* With respect to plaintiff, numerous complaints and problems had been raised by customers in her territory. *Id.* In the first quarter of 1997, Richards presented Weitzel with a reorganization plan that included geographically realigning the districts in the Eastern Division. *Id.* ¶ 10. The plan included relocating plaintiff to the Mid–Atlantic region as district manager and demoting Patric to district trainer. *Id.*

Richards' testimony is similar. During the time plaintiff was a district manager for the New York Metro area, Richards was aware of a number of customer complaints regarding her performance. *See* Richards V.S. ¶ 4. Among other complaints, U.S. Air in Burlington (Vermont), U.S. Air in Boston, United Express in Boston, and American Airlines in Stewart, all expressed dissatisfaction and lodged complaints during plaintiff's tenure as a district manager. *Id.* In addition, plaintiff failed to adequately communicate with both ITS and ITS's customers. She also failed to inform Richards of problems that arose at her sites, one being when an ITS security guard at JFK Airport in New York City hit a passenger who was holding a baby. *Id.* In addition, plaintiff's failure to communicate with customers—neglecting, for example, to inform U.S. Air in Burlington in advance of ITS's billing rate increases—led to customer dissatisfaction. *Id.*[10] Finally, plaintiff failed to increase business within her district while she was

---

10. In her certification, plaintiff states that these rate increases were communicated by the ITS controller to U.S. Air headquarters. *See* Lemke Cert. ¶ 5B. Assuming this to be true, it does not call into question Richards'

statement that plaintiff failed to facilitate customer relations by alerting the local U.S. Air officials within her district of the imminent increases.

a district manager reporting to Richards. *Id.*.

Richards maintains that his reorganization plan for the Eastern Division was premised upon his business judgment that geographic alignment of the districts would be more efficient and profitable and realignment of the district managers was necessary to facilitate a stronger business team. *Id.* ¶ 5. He concluded that not only did it make little sense for plaintiff to be located in Newark when she had no responsibility for that territory, but that the Eastern Division would be better served by relocating plaintiff to the Mid–Atlantic region as there had been significant customer dissatisfaction at sites in her district during her tenure. *Id.* ¶¶ 5, 8.

The statements of Weitzel and Richards are amply supported by a number of customer surveys which reflect dissatisfaction with plaintiff by customers within her district. For example, on March 21, 1997, U.S. Air at the Burlington International Airport in Vermont gave plaintiff the second to lowest rating regarding management support. *See* Reimer Cert. dated Feb. 3, 1999, Exh. H–1. In addition, on June 12, 1997, U.S. Air in Burlington gave plaintiff the lowest possible rating, noting that "[plaintiff] has since left the company so time will tell as to the new management." Podbielski V.S.,[11] Exh. 1. These evaluations resulted in Patricia Podbielski, a Customer Services Manager of ITS, calling U.S. Air in Burlington to discuss the comments and ITS's commitment to customer service. *See* Podbielski V.S. ¶¶ 1, 4. Finally, U.S. Air at MacArthur Airport on Long Island evaluated plaintiff as only adequately responding to customer inquiries. *Id.*, Exh. 3.

■ Once defendants have proffered legitimate non-discriminatory reasons for their actions, as they have here, "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. The Court of Appeals for the Third Circuit has articulated the quantum of proof required to make this showing, rejecting both the position that plaintiff may avoid summary judgment by simply arguing that the factfinder need not believe the defendants' proffered reasons as well as any requirement that plaintiff must adduce evidence directly contradicting the defendants' reasons. *See Fuentes*, 32 F.3d at 764. Instead, plaintiff's evidence "must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (citations omitted).

■ Stated somewhat differently, in the summary judgment context, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (citations omitted and brackets in original). This requires more than simply criticizing the defendants' assertions in a fashion similar to the "schoolground retort, 'Not so[.]'" *Id.* at 766. Recognizing that this standard places a high burden on plaintiffs, the Third Circuit acknowledged that it "arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Id.* (quoting *Ezold v. Wolf, Block, Schorr and, Solis–Cohen*, 983

---

11. The Verified Statement of Patricia Podbielski is attached as Exhibit F to defendants' Appendix of Exhibits in Support of Motion for Summary Judgment.

F.2d 509, 531 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)).

Plaintiff has not met her burden of showing that a reasonable factfinder could find that defendants' proffered reasons for their actions were merely pretextual and that gender discrimination was the true reason. To reiterate and summarize, defendants essentially set forth three reasons for their actions: first, the performance of the Eastern Division of ITS had worsened and it was thought that reorganizing the districts along geographic lines would increase efficiency and profitability, *see* Def. Br. at 29; Weitzel V.S. ¶ 9; second, defendants believed that it defied sound business judgment for plaintiff to be based in a location (Newark) that was not within her territory of responsibility and that it made more sense that she be located in a major site within her district, as all of the other district managers were, *see* Def.Br. at 29; and, finally, defendants were concerned about complaints and problems stemming from sites within plaintiff's district and, because of those concerns, it was decided that she should not assume the duties of district manager of the new Northeastern region. *Id.*

Plaintiff has presented absolutely nothing to refute the first two reasons set forth by defendants. Indeed, she does not even take issue with defendants' assertions that the Eastern Division was in need of improvement, that redistricting was an attempt to increase efficiency and profitability,[12] and that all other district managers were based within their districts while she was not. Parenthetically, plaintiff notes in passing that she did not elect to be based in Newark and that "[i]t is[, therefore,] difficult to imagine how ITS can blame me for their decision to place my office in

Newark." Lemke Cert. ¶ 6. Plaintiff missess the point. Who was responsible for placing plaintiff in Newark and why does not detract whatsoever from defendants' assertion that it made more business sense to have their district managers based at sites within their districts.

Plaintiff, while not disputing much less refuting defendants' reasons for their actions, argues, however, that, one, defendants do not adequately support their position that plaintiff was terminated because of a reduction in force; two, contrary to defendants' contention, plaintiff was in fact terminated; and, three, statements about deficiencies in plaintiff's performance are a recent fabrication and must be rejected. *See* Pl.Br. at 12–13; Reimer Cert. dated Feb. 3, 1999 ¶¶ 9–19. These arguments have no merit.

First, defendants *have not argued* that plaintiff was terminated in accordance with a business judgment to reduce its work force due to economic necessity. Indeed, contrary to a reduction in force scenario, both sides agree that defendants offered plaintiff a transfer to another region along with the retention of her job title, salary and benefits. *See* Pl.Dep. at 427–28. There is absolutely no mention of a company-wide reduction in force policy as justification for defendants' actions toward plaintiff.

This court also rejects plaintiff's argument that, contrary to defendants' contention, plaintiff did not quit but was terminated. As stated previously, this court need not, and indeed cannot, tread into the disputed arena of whether plaintiff was terminated or simply quit when she was offered a transfer and told that her present position would no longer be available. This court has simply assumed that plain-

---

**12.** Plaintiff states that "[t]he alleged 'geographical' reorganization is without any foundation, since ITS [sic] subsequent reorganization involved a district that was both north and south of Newark and for which Newark was the central point." Lemke Cert. ¶ 6. Without any further explanation given, this

court is uncertain what plaintiff is trying to say and finds that this statement alone does not create a genuine issue of material fact such that a trier of fact could find that defendants' purported reasons for redistricting were a mere pretext for discrimination.

tiff suffered an adverse employment action at the hands of defendants, be it a transfer or a termination, a fact which, while pertinent to the *prima facie* step of the analysis, is irrelevant for purposes of whether plaintiff has amply refuted defendants' reasons for their actions.

Finally, and more on point, plaintiff takes issue with defendants' evidence that she was not an effective district manager. Plaintiff first attempts to refute Weitzel's testimony regarding deficiencies in her performance while the General Manager at Washington D.C. airport and while she served as a terminal manager at the Continental terminal in Newark. *See* Pl.Br. at 21–23. Specifically, plaintiff points out, *inter alia*, that she was made a terminal manager on the basis of her success in Washington D.C. and that she received a glowing evaluation while she was terminal manager. This does not satisfy plaintiff's burden, however, because at no time do defendants refer to plaintiff's performance while a general manager or a terminal manager as justification for their actions. The decision to eliminate plaintiff's last position and offer her a transfer allegedly stemmed, in part, from problems while she was a *district* manager, not a general or terminal manager. Thus, the fact that plaintiff purportedly performed well in prior positions does not demonstrate a weakness, inconsistency or incoherency in defendants' evidence that their actions were based upon plaintiff's ineffectiveness while she was a district manager such that a reasonable trier of fact could find defendants' reasons to be simply a cover-up for a true discriminatory intent. *See Fuentes*, 32 F.3d at 765.

As for allegations regarding plaintiff's performance while a district manager, plaintiff states, but only in her brief, that the problems she experienced were with cities which were not originally within her district, namely Boston and Burlington, Vermont. *See* Pl.Br. at 23–24. That statement does not create a genuine issue of material fact. Whether or not the sites in the Northern region were part of plaintiff's original territory does not call into question defendants' evidence that plaintiff was not effective in the Northern region and would be better suited for the Mid–South region.

Neither is plaintiff's case advanced by some other bits and pieces which, at best, raise peripheral concerns. She has, for example, submitted a group of customer surveys, two of which rank her highly, namely one from Boston and one from Allentown, Pennsylvania. *See* Reimer Cert. dated Feb. 3, 1999, Exh. H. These positive customer surveys do not create a genuine issue of fact as to defendants' proffered reasons for their actions because defendants have not asserted that plaintiff received nothing but poor ratings. Indeed, if that were the case, it is doubtful in the extreme that defendants would have offered to transfer plaintiff to another district. Rather, defendants assert that they made a business judgment to transfer plaintiff because, among other reasons, she had experienced some problems with certain sites within her district. That assertion is not called into question by two positive reviews from other sites within the district.

Neither does it help even if, as plaintiff suggests, Richards misunderstood the history of the Eastern Division or that her responsibilities in the aviation industry prior to coming to ITS was not as limited as he believed. *See* Lemke Cert. ¶¶ 3, 4. Quite simply, neither of these irrelevant contentions, even if taken as true, raises an issue of fact as to whether defendants' reasons for their actions vis-a-vis plaintiff were merely fabrications to cover up intentional discrimination.[13]

---

13. Although not referenced anywhere in her brief, plaintiff has submitted the certification of Patricia Painter, a Human Resources Manager in the Eastern Division of ITS from September 5, 1995 to July 1, 1997. *See* Reimer Cert. dated March 3, 1999, Exh. C. None of the statements in Painter's certification establishes an issue of fact regarding pretext, and

In sum, plaintiff has not met her burden of showing an issue of material fact as to whether defendants' reasons for their actions were merely pretextual. This, coupled with the fact that when ITS was reorganized, although plaintiff was asked to transfer to the Mid–South region, another male district manager was demoted, convinces this court that there is no basis on which a reasonable factfinder could conclude that defendants' actions were fueled by discrimination. Defendants are, therefore, entitled to summary judgment as to plaintiff's Title VII and NJLAD claims.[14]

### B. *Intentional Infliction of Emotional Distress Claims*

██ Counts Three and Four of plaintiff's amended complaint set forth claims for the intentional infliction of emotional distress, albeit in slightly different terms. Defendants move for summary judgment as to each of these counts and plaintiff has submitted no opposition.

██ It is clear to this court that summary judgment is warranted on the intentional infliction of emotional distress claims. To establish a claim for intentional infliction of emotional distress under New Jersey law, a plaintiff must show that: (1) defendants acted intentionally or recklessly; (2) the conduct was "extreme and outrageous;" (3) defendants' actions were the proximate cause of plaintiff's emotional distress; and (4) plaintiff suffered "severe emotional distress." *McNemar v. The Disney Store, Inc.*, 91 F.3d 610, 622–23 (3d Cir.1996) (applying New Jersey law), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997); *see also Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 366, 544 A.2d 857 (1988).

██ Plaintiff's claims fail because she cannot establish that defendants' conduct was "extreme and outrageous." New Jersey courts hold that to satisfy this element, a plaintiff must show that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366, 544 A.2d 857 (adopting standard set forth in Restatement (Second) of Torts § 46 (1965), comment d). Thus, plaintiff must allege conduct on the part of defendants such that "the recitation of facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim, 'Outrageous!' " *Borecki v. Eastern Int'l Management Corp.*, 694 F.Supp. 47, 61 (D.N.J.1988) (applying New Jersey law and quoting the Restatement (Second) of Torts § 46, comment d).

██ Plaintiff alleges only that defendants' discriminatory discharge of her constituted extreme and outrageous conduct. New Jersey courts have repeatedly held that success on an intentional infliction of emotional distress claim arising from the workplace is "extremely rare." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *see also King v. Port Authority of New York & New Jersey*, 909 F.Supp. 938, 943 (D.N.J.1995), *aff'd*, 106 F.3d 385 (3d Cir. 1996); *McWilliams v. AT & T Info. Sys. Inc.*, 728 F.Supp. 1186, 1194 (W.D.Pa. 1990). Moreover, New Jersey courts do not perceive terminations of employment,

this court will give that certification the same short shrift it has been given by plaintiff.

**14.** In light of this disposition, this court need not reach defendants' argument that Richards cannot be held individually liable under Title VII or NJLAD. Parenthetically, however, in the Title VII context, it is abundantly clear that individual employees cannot be held liable under Title VII. *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1077 (3d Cir.1996), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997).

In addition, this court need not address defendants' argument that plaintiff has failed to adequately mitigate damages.

in and of themselves, as evidence of the intentional infliction of emotional distress, but rather as a common occurrence in the workplace. *See Cox,* 861 F.2d at 395 ("In the context of a dismissal . . . 'while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event' and cannot provide a basis for recovery for intentional infliction of emotional distress.") (citation omitted); *Borecki,* 694 F.Supp. at 61 ("Generally, decisions to discharge an employee have not been found to constitute intentional infliction of emotional distress."). Even terminations based on discrimination, without accompanying harassment or something akin thereto, do not state a cause of action for the intentional infliction of emotional distress. *See Borecki,* 694 F.Supp. at 62 ("[C]ourts which have considered terminations of employment taken for discriminatory reasons, but unaccompanied by harassment, have found there could be no recovery for intentional infliction of emotional distress.") (citing cases); *McNemar,* 91 F.3d at 623 (under New Jersey law, "termination of employment does not, without evidence of harassment, support a claim of intentional infliction of emotional distress").

In short, the actions of the defendants do not manifest the degree of extreme and outrageous conduct required for a claim of intentional infliction of emotional distress. Plaintiff has alleged absolutely no harassing conduct which could be said to elevate her discriminatory discharge claim to the realm of this strictly defined tort. Indeed, plaintiff admits that Richards and Weitzel always conducted themselves in a business-like manner during their interactions with her. *See* Pl.Dep. at 158, 163–64, 172. At no time, she adds, did Richards ever physically threaten her, scream or yell at her, or even touch her aside from an occa-

sional handsh⸱, .c.. *See id.* at 172.[15] Because a claim for the intentional infliction of emotional distress is reserved for conduct that goes well beyond termination of employment, even for allegedly improper reasons, plaintiff's claims must fail.

■ If more were needed, and assuredly it is not, "severe" emotional distress is required in order to sustain a claim for the intentional infliction of emotional distress. The requisite severity has been defined as "so severe that no reasonable man [or woman] could be expected to endure it." *Buckley,* 111 N.J. at 366, 544 A.2d 857 (citation omitted). Quite simply, plaintiff admitted during her deposition that her emotional distress has *never* been severe, that she has never had any physical symptoms due to her emotional distress, and that she has never taken any medication to treat her emotional distress. *See* Pl.Dep. at 462.

Accordingly, defendants are entitled to summary judgment on Counts Three and Four of the amended complaint.

### C. Equal Pay Act Claim

■ Finally, plaintiff alleges in Count Five of her amended complaint that defendants violated the Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by paying her less than the male district managers at ITS. The EPA provides that:

No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are preformed under similar working conditions, except where such payment is made pursuant to (i) a seniority system;

---

**15.** In contrast, a jury question as to the intentional infliction of emotional distress was presented where the plaintiff "received sexually offensive and threatening letters in her mail box at work, was the subject of crude and demeaning remarks and graffiti, as well as other humiliating treatment by her supervisors prior to her termination. . . ." *Borecki,* 694 F.Supp. at 61 (discussing *Porta v. Rollins Envtl. Services,* 654 F.Supp. 1275 (D.N.J. 1987), *aff'd,* 845 F.2d 1014 (3d Cir.1988)).

(ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . .

29 U.S.C. § 206(d) (1998); *see also Brobst v. Columbus Services Int'l,* 761 F.2d 148, 150–51 (3d Cir.1985).

■■■ To establish a *prima facie* case under the EPA, plaintiff must show that: an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

*Dubowsky v. Stern, Lavinthal, Norgaard & Daly,* 922 F.Supp. 985, 990 (D.N.J.1996) (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)); *see also Byrd v. Ronayne,* 61 F.3d 1026, 1033 (1st Cir.1995) (stating that a *prima facie* case under the EPA is established when plaintiff shows that "the employer paid different wages to an employee of the opposite sex for substantially equal work"). Once a *prima facie* case has been established, the burden of persuasion shifts to the employer to establish one of the four affirmative defenses listed in the statute: namely, that the pay differential is due to either a seniority system, a merit system, a system which measures earnings by quality or quantity or production, or a reason other than sex. *See Equal Employment Opportunity Comm'n v. State of Delaware Dep't of Health and Social Services,* 865 F.2d 1408, 1414 (3d Cir.1989); *see also* 29 U.S.C. § 206(d).

Defendants move for summary judgment on plaintiff's EPA claim contending that she has failed to establish a *prima facie* case. Plaintiff, again, has submitted no opposition.

Defendants argue that, under *Hein v. Oregon College of Educ.,* 718 F.2d 910, 916 (9th Cir.1983), plaintiff is required to show that her salary was lower than the average wages paid to employees of the opposite sex performing substantially equal work.[16] Because plaintiff identified her comparator pool to be the other Eastern Division district managers, i.e. Collins, Michel, Patric, Pudlak, and Watson, and the time periods for alleged unequal pay to be April 1996 and April/May 1997, defendants argue that plaintiff has failed to meet her burden as her salary was higher than the average salary of her five male counterparts both in April 1996 and April/May 1997. Plaintiff does not dispute defendants' representation of the salaries of the Eastern Division district managers at issue here, nor does she argue that an average salary should not be utilized in the comparison. Plaintiff has, therefore, failed to establish a *prima facie* case of unequal pay under the EPA.

In addition, defendants argue that, even if only the two male district managers whose wages were higher than plaintiff during the specified time periods (Pudlak and Collins) are used as comparators, plaintiff has failed to present evidence establishing that Pudlak and Collins were working in substantially equal jobs. In order to set forth a *prima facie* case under the EPA, plaintiff must show that she was paid less than male employees at ITS in positions requiring equal skill, effort and responsibility and with similar working conditions. *See Mullenix,* 965 F.Supp. at 139; *see also* 29 U.S.C. § 206(d). Although all of the persons at issue here were titled "district managers," it is clear that the inquiry centers around actual job content as opposed to job titles or descriptions. *See Brobst,* 761 F.2d at 155; *see also Mullenix,* 965 F.Supp. at 139. It is

---

**16.** There is some case law which indicates that the plaintiff need only establish that she was paid less than a single similarly situated male employee to prove her EPA claim. *See Dubowsky,* 922 F.Supp. at 990; *Mullenix v.*

*Forsyth Dental Infirmary for Children,* 965 F.Supp. 120, 139 (D.Mass.1996). Plaintiff, however, does not argue that the standard set forth in *Hein* should not be applied.

plaintiff's burden both to establish a *prima facie* case and to come forward with evidence in opposition to defendants' motion for summary judgment. She has come forward with nothing comparing her position at ITS to the positions held by Pudlak and Collins, rendering her *prima facie* case deficient. *See Creech v. Ohio Cas. Ins. Co.*, 944 F.Supp. 1347, 1353 (S.D.Ohio 1996) (holding that the court could not assume that the same job title means equal work for purposes of the EPA).

Accordingly, defendants' motion for summary judgment on Count Five will be granted.

## II. CONCLUSION

For the above stated reasons, defendants' motion for summary judgment is granted. Conversely, plaintiff's cross-motion for summary judgment is denied. An appropriate order will issue.

## ORDER

This case having come before the court on defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment; and the court having reviewed the submissions of the parties without oral argument pursuant to Fed. R.Civ.P. 78; and consistent with this court's opinion of even date;

IT IS on this 15th day of July, 1999, hereby

ORDERED that defendants' motion for summary judgment is granted; and it is further

ORDERED that plaintiff's cross-motion for summary judgment is denied.